IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

_____
                                )
UNITED STATES OF AMERICA        )
                                )
     v.                         )   Case No. 8:24-cr-00177-DLB-1
                                )
MINH PHUONG NGOC VONG, et al., )
                                )
              Defendant.        )
_____)

                              Greenbelt, Maryland
                              December 4, 2025
                              10:17 a.m.


                    SENTENCING HEARING
        BEFORE THE HONORABLE DEBORAH L. BOARDMAN
              United States District Judge


              A P P E A R A N C E S

ON BEHALF OF THE GOVERNMENT:

    OFFICE OF THE UNITED STATES ATTORNEY,
      DISTRICT OF MARYLAND
    36 S. Charles Street, 4th Floor
    Baltimore, Maryland  21201
    BY:  CHRISTINA A. HOFFMAN, ASSISTANT U.S. ATTORNEY
         (410) 209-4871
         christina.hoffman@usdoj.gov

                    (Continued)


                 Patricia Klepp, RMR
              Federal Official Court Reporter
              6500 Cherrywood Lane, Suite 200
                Greenbelt, Maryland  20770


          Produced by Stenographic Computer-Aided Transcription

A P P E A R A N C E S (Cont'd)

ON BEHALF OF THE DEFENDANT:

    JULIE M. REAMY, ATTORNEY AT LAW, LLC
    1 Olympic Place, Suite 900
    Towson, Maryland  21204
    BY:  JULIE MARIE REAMY, ESQUIRE
       (410) 605-0000
       reamylaw@gmail.com

ALSO PRESENT:

    MINH PHUONG NGOC VONG
    SPECIAL AGENT MICHAEL CASIAS - FBI
    USPO NICOLE WONNEMAN

P R O C E E D I N G S

(Call to order of the Court.)

THE COURTROOM DEPUTY:  All rise.  The United States District Court for the District of Maryland is now in session, the Honorable Deborah L. Boardman presiding.

THE COURT:  All right.  Good morning, everyone.  Please be seated.  I apologize for being late; thank you for understanding.

Would the Government call the case.

MS. HOFFMAN:  This is United States v. Minh Vong.  It's case No. DLB 24-177.  I'm Christina Hoffman on behalf of the United States.  I have Special Agent Mike Casias from the FBI with me here at counsel table, and we're here for Mr. Vong's sentencing.

THE COURT:  All right.  Good morning.

MS. REAMY:  Good morning, Your Honor.

For the record, my name is Julie Reamy.  I represent Minh Vong, who's present to my left.

THE COURT:  All right.  Good morning to both of you.

THE DEFENDANT:  Good morning, Judge.

THE COURT:  All right.  Please be seated.

Please introduce yourself from Probation.

THE PROBATION OFFICER:  Good morning, Your Honor.  .  Nicole Wonneman from Probation.

THE COURT:  All right.  How are you?

THE PROBATION OFFICER:  I'm well; how are you?

THE COURT:  Good, thank you.

All right.  So earlier this year on April 15th, Mr. Vong appeared before me and pled guilty to Count One of the indictment, which charged him with conspiracy to commit wire fraud in violation of Title 18 of the United States Code, Section 1349.  Upon a finding of guilt, I ordered the preparation of a presentence investigation report and scheduled sentencing.

So in advance of today's hearing, I have read the PSR, which is at ECF 34; I have read Mr. Vong's sentencing memo and the exhibits that were attached to it, including the psychological evaluation; I have read the government's sentencing memo; and the motion for a preliminary order of forfeiture.

So Ms. Hoffman, is there anything else that I should have received before sentencing that I haven't mentioned?

MS. HOFFMAN:  We did file that exhibit, which was the transcript from the Chapman sentencing, which I neglected to -- I thought I had attached it originally, but I had not.  So we filed that yesterday, but I think that covers it all.

THE COURT:  All right.  Yes, thank you, I did receive that yesterday.

Ms. Reamy, is there anything else that I should have received but didn't mention?

MS. REAMY:  No, Your Honor.

THE COURT:  All right, thanks.

So Ms. Hoffman, have all victims been notified, and are there any victim that wish to speak to the Court today?

MS. HOFFMAN:  The victims have been notified, and no, there are no victims who wish to speak to the Court today. I believe one victim representative was here at the guilty plea, but we don't have anyone here today.

THE COURT:  All right, thank you.

All right, let's start with the PSR.  Ms. Hoffman, have you had chance to review it, and do you have any objections or corrections?

MS. HOFFMAN:  We have reviewed it, and we do not have any objections or corrections.

THE COURT:  All right.

Ms. Reamy, same question.

MS. REAMY:  I have reviewed it, Mr. Vong has reviewed it.

THE COURT:  Make sure you're speaking into the microphone.

MS. REAMY:  I apologize.

THE COURT:  Move the microphone.

All right.

MS. REAMY:  I have reviewed it, Mr. Vong has reviewed it; we have no objections.

THE COURT:  All right, thank you.

So Mr. Vong, you've reviewed the presentence investigation report?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And any questions that you might have had, you asked your lawyer?

THE DEFENDANT:  Yes.

THE COURT:  Have all of your questions about the PSR been answered by your lawyer?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.

So let's start with the guidelines calculation, which is where we always start at sentencing, and I am now referring to the PSR, starting on page 8.

I will adopt the calculation, and the calculation is as follows:

There is a base offense level of 7 for this offense, pursuant to sentencing guidelines 2X1.1(a) and 2B1.1(a)(1), because the offense of conviction has a statutory maximum term of imprisonment of 20 years or more.  The parties have agreed and I will adopt -- they have agreed to and I will adopt a 14-level enhancement, pursuant to Application Note 21(A)(ii) of the fraud guidelines, because the offense caused or risked substantial nonmonetary harm, namely, harm to the national security of the United States.

I will not impose an enhancement for the loss amount per the agreement of the parties and the recommendation of the Guidelines and Probation.  There is a 2-level enhancement because the offense involved 10 or more victims under Guideline 2B1.1(b)(2)(A)(i), and there is a 2-level enhancement because a substantial part of the fraudulent scheme was committed outside the United States.  That's pursuant to Section 2B1.1(b)(10)(B).

Mr. Vong is what we call a zero-point offender; he meets the criteria in Sentencing Guideline 4C1.1(a)(1) through (10), so he is entitled to a 2-level reduction.  He's entitled to another 2-level reduction for acceptance of responsibility.

Ms. Hoffman, are you making a motion for an additional 1-level reduction to recognize the fact that Mr. Vong pled guilty early?

MS. HOFFMAN:  Yes, we are.

THE COURT:  The motion is granted.

The final offense level is 20 after all of those calculations.

Turning to Mr. Vong's criminal history, he has no prior criminal history, zero criminal history points.  He falls into the lowest criminal history category of I.  The advisory guidelines range for this case is 33 to 41 months.  That's at level 20, Criminal History Category I.

Ms. Hoffman, do you agree with my calculation of the

guidelines?

MS. HOFFMAN:  Yes, I do.  Thank you.

THE COURT:  Ms. Reamy.

MS. REAMY:  Yes, Your Honor.

THE COURT:  All right.

We will now have a sealed portion of the proceedings, which happens in all of our criminal cases in the District of Maryland.

(Conference at the Bench.)

It is the policy of this Court that every guilty plea and sentencing proceeding include a bench conference concerning whether the defendant is or is not cooperating.

(Open Court.)

THE COURT:  All right, we're back on the public record.

Let's address the financial aspects of the sentence. There will be no fine, no fine has been requested.  A fine is certainly not appropriate in this case, where Mr. Vong could not afford one.  I don't think it would serve any useful sentencing purpose.

Ms. Hoffman, there's no restitution request; is that correct?

MS. HOFFMAN:  That's correct, Your Honor.

THE COURT:  All right.  I do have a preliminary order of forfeiture, whereby Mr. Vong would agree to give up or

forfeit any right he may have to several laptops, iPhones, currency, U.S. and Canadian. All of those are listed in the preliminary order of forfeiture.

Ms. Reamy, any objection to my signing this order?

MS. REAMY: No, Your Honor.

THE COURT: All right.

There is a special assessment of $100, which is imposed in every case where there's a felony conviction.

All right. Ms. Hoffman, I have read your sentencing submission. Do you have to an oral statement on behalf of the United States? And if so -- perhaps you could go to the podium, because the microphone is closer to everyone's mouth there, and I want to help the court reporter out and help myself out.

MS. HOFFMAN: I also have a quiet voice, so I apologize.

THE COURT: No problem.

MS. HOFFMAN: Well, I want to start by saying that it's been a pleasure working with Ms. Reamy in this case. I think she's been a very effective advocate for her client.

We obviously come out in different places; she is recommending a sentence of home confinement, we are recommending a sentence of 30 months in prison. I think -- you know, we have different jobs, obviously; it's her job to zealously advocate for Mr. Vong, and it's my job to do my best to try to come up with what is the most just sentence based on the 3553(a)

factors, and that's what I have attempted to do.

The nature and circumstances of the offense are extremely serious here.  The defendant participated in a scheme to defraud at least a dozen U.S. companies and also four different United States Government agencies out of close to $1 million, and he knowingly -- as part of that scheme, he knowingly granted access to sensitive IT systems of these U.S. companies and government agencies to individuals who he knew were located in China and who he had reason to believe had interests that were adverse to the United States.

He also, as part of the scheme, transmitted the majority of the money that was generated -- it was -- you know, it was close to $1 million.  He kept 20 to 30 percent for himself and transmitted the rest to these individuals overseas. He knew, of course, that these employers, these companies would not have hired him if they had known the truth, if they had known that he didn't have these IT credentials, and that it was actually these foreign individuals who were performing the work and accessing these sensitive systems, but he did it anyway, and he did it for profit.

He -- you know, we -- he has said that he did not know that they were connected to North Korea, and perhaps he didn't, perhaps he believed that they were Chinese.  We think there is evidence that he at least was aware of a risk that they were connected to the North Korean government, because as we pointed

out in the memo, in one conversation with John Doe, when John Doe mentioned that he was located in Shenyang, China, Mr. Vong responded with the comment, North Korean alliance, and, Close to North Korea.  So he was aware that they were proximate to North Korea and I think aware that at least a risk that there was some connection there.

And I think it's also important point out -- I think we noted in the sentencing memo that that conversation happened pretty early on in the scheme.  And I'm searching for the date here.  I believe it was in 2020, which was early on in the scheme.  And so he had that awareness and continued to do this.  So we think that the nature and circumstances of the crime are very serious.

The defendant's history and characteristics --

THE COURT:  Hang on, let's pause there.

MS. HOFFMAN:  Sure.

THE COURT:  I have some questions about defense.

Did the people that were involved in the scheme, the John Doe and their counterparts in China or elsewhere, did they actually perform the work; were they really software engineers, did they do the work that they were hired to do?

MS. HOFFMAN:  Yes, at least for some period of time, they did the work that they were hired to do, and that's why they were able to keep up this scheme for as long as -- as they were.  They did really have this expertise.  Of course, you

know, we don't know and probably will never know what else they were doing with access to these systems.

THE COURT: Well, that was my next question. What -- if you can share, have there been any forensic analyses of what they had access to, their computers, the American systems they had access to?

MS. HOFFMAN: Well, we know, of course, that, you know, laptops were actually shipped to these conspirators overseas, so they had access to the laptops, they -- Mr. Vong picked up PIV cards, you know, government PIV cards and granted access to these systems to these people. We don't have -- we really just don't have insight or knowledge as to how the information could be used.

THE COURT: Well, what information did they have access to?

MS. HOFFMAN: So --

THE COURT: Was this State secrets, was this SCI information; was there anything confidential, even?

MS. HOFFMAN: So I don't think we have evidence that it was classified information, but we do, as noted in the plea statement of facts -- so for example, U.S. Company 1, which hired Mr. Vong, assigned him to work on a contract for the Federal Aviation Administration, and that contract involved working on a software application that was used by various U.S. Government agencies to manage sensitive information

regarding national defense matters.

And I think -- you know, so it's clear that there was sensitive information there that could potentially be used to harm the United States, but we don't know -- we don't know how it was used or if it's been used to harm the United States' interests.

I think, considering Mr. Vong's culpability, though, it is, you know, certainly important to note that he was aware that these people were accessing these sensitive systems and that there had to be a risk; these companies would not have hired these individuals if they had known their true identities and who they were working for.

THE COURT:  How much money did Mr. Vong profit after taxes, and were taxes taken out of the paychecks, or did -- was he responsible for the taxes, like you are when you have a 1099?

MS. HOFFMAN:  So in -- so Mr. Vong has indicated that in all, the profit was not substantial, because of taxes.  We do not have verification in the form of tax records of exactly how much was paid in taxes, but we know that just in terms of the money that was going to his bank accounts that he controlled, it was close to a million and that roughly 70 to 80 percent was transmitted abroad.

THE COURT:  But I guess, just to get back to the taxes question, were taxes paid on this income, and if so, who paid the taxes, do you know?

MS. HOFFMAN:  So to the extent they were paid, they would have had to be paid by Mr. Vong.  We didn't get a tax order in this case, and so I can't, you know -- unfortunately, I can't tell you whether taxes were paid on all this money and how much -- how much in taxes was paid.

THE COURT:  But you provided me in your memo a summary of his income and his taxes, so that's why I'm a little confused.

MS. HOFFMAN:  So the -- so those are just Maryland wage records, not tax records.

THE COURT:  All right.

Okay, all right.

You provided me with a transcript of a sentencing hearing from earlier this year in the District of Columbia before Judge Moss, so I reviewed that -- and I'm not at all minimizing the severity of this crime, let me be clear, and I appreciate your candor in your memo when you compared this crime to that crime, but I'd like to hear more about the comparison.

MS. HOFFMAN:  Yeah.  So I think, one of the biggest differences is that Christina Chapman, who's the defendant in that other case, committed aggravated identity theft, by which I mean, she actually used fake IDs of other people, who were not aware that their IDs were being used.  Mr. Vong, as far as we know, did not do that in this case; he used his own ID, and I do think that that is the most significant difference.  Of course,

there's also a difference of scale; Ms. Chapman was able to obtain employment with a greater number of companies and generate a larger amount of revenue.  But I -- in my mind, the most salient difference is the aggravated identity theft.

So I certainly think that there are differences, and we are not -- you know, in that case, I can't remember what the government asked for; it was something above 102 months.  She was ultimately sentenced to 102 months.

And we're, of course, not -- not asking for anything close to that in this case, but the reason I included it is, because as I mentioned, there -- this is only the second case like this to go to sentencing, and so I think it's a relevant data point to look at.  And I think that the Judge's reasoning in fashioning that sentence is useful, and a lot of it applies here, in terms of his culpability, what he knew, what he should have known.

THE COURT:  Well, that case looks like it was a C plea to a range of 70 to 87 months on Count Two -- on Counts Two and Six, followed by 24 consecutive for the ag ID on a different count.  So that was a C plea, and the Judge -- that's my understanding; I'm looking at page 15 of the transcript.

Am I wrong?

MS. HOFFMAN:  No, that's correct, Your Honor.

THE COURT:  Okay.

MS. HOFFMAN:  Yeah.

THE COURT:  All right.

MS. HOFFMAN:  So --

THE COURT:  That also makes that case slightly different than this case, as far as ... it makes it slightly different than this case also.

MS. HOFFMAN:  Sure, and so the top of the C plea range there, if I'm doing the math right, would have been 111 months, which I believe is what the government asked for, and then the Court came down in the middle, at 102 months.

THE COURT:  Okay.

MS. HOFFMAN:  So -- and I'm happy to answer, of course, any questions Your Honor has; please feel free to interject.  I did want to just sort of continue marching through the 3553 factors.

THE COURT:  Yes.

MS. HOFFMAN:  The defendant's history and characteristics, I think, on balance, do weigh in favor of a lower sentence.  It's clear -- first of all, it's clear from the PSR and from Ms. Reamy's excellent sentencing memo and exhibits that the defendant has had a difficult life, growing up in a refugee camp and suffering various forms of privation and hardship.  He has no criminal history prior to this, and he has accepted responsibility and, I think, demonstrated remorse for his crime.  And I think those are significant factors that we have weighed heavily in considering the appropriate sentence.

I think, also, as in the Christina Chapman case, you know, based his history and characteristics, the likelihood of recidivism is probably low, and so protection of the public is not a predominant factor in my mind.

However, I think those factors have to be balanced against the very bad decisions that Mr. Vong made in this case. You know, this country obviously took him in and gave him opportunities that he wouldn't otherwise have had, and he became involved in this fraud scheme that was, I think, very obviously detrimental to the national security of the United States.  And I think it's also important that this wasn't just, you know, a single snap decision or an impulsive act; it was a fraud scheme that was carried out over the course of almost four years, and he took, you know, daily actions in operating this laptop farm and keeping it going.

THE COURT:  Ms. Hoffman, first, I want to thank you so much for actually going through the factors and being candid when they weigh in favor of a reduced sentence.  Honestly, we don't see that every day, and I want to appreciate that because think that's being faithful to the law, and it gives you a great deal of credibility.  So thank you.

MS. HOFFMAN:  Oh, of course.

THE COURT:  Here is my next question, or here's my question.  You just mentioned that there was, I believe -- I don't have the transcript in front of me, but talking about

national security, what I thought I heard you say, that there was an actual threat to national security.

What I have -- based on the record, though, it seems like there was a potential threat to access or threat resulting from access to sensitive information, and in this day and age, I think we just need to be careful, because -- and I think you are being careful -- there has been no national security breach as far as I know based on the information.  There was access to sensitive information.  I don't know what that is; that could be a range of information, it could be extremely sensitive information, and it could be perhaps less so.

So how do I factor those facts here?

MS. HOFFMAN:  Sure.  So first of all -- well, I mean, I would say there -- in my mind, there was a breach, because the access was there, right; these people did access these systems. What we don't know is how they used that information, so we don't know whether that information was or will be used in any way to -- you know, for example, with respect to the FAA national defense information, whether that will be used by North Korea in any way adverse to the United States.  We don't know how it will be used, whether it has been used, but I would disagree on whether there was a breach; I would say it was a breach.

I would also say that one of the biggest -- biggest risks to national security here was actually in the form of the

money, right?  So there's a substantial amount of money that was flowing to these overseas conspirators, and we know from other cases that this money is going back to the North Korean regime and that North Korea is of course using it for all sorts of nefarious purposes.

THE COURT:  So tell me --

MS. HOFFMAN:  That is a big --

THE COURT:  Tell me more about that, because I am interested in where the money ultimately was going.  So you've mentioned a couple of times, we know from other cases that the money has gone to the North Korean government.  Can you tell me more about that.

MS. HOFFMAN:  Yeah, so I -- what I can tell you is that this is a big priority for the Department of Justice, because of the amount of money that's involved, and I think we put in our sentencing memo that, you know, a UN panel of experts has estimated that there are something like 3,000 of these North Korean IT workers who are generating somewhere around half a billion dollars for the North Korean regime every year through this scheme.

We don't have -- and I apologize, but we don't have the specifics in this case to be able to trace -- you know, trace the money exactly where it went.  These -- of course, these are individuals in China; we have very limited access and insight into what happens to money once it goes over to China.

But this is -- it's a big priority for the Department of Justice, it's a sprawling and sophisticated scheme, and the unfortunate reality is that the United States Government is very unlikely to be able to ever apprehend or, you know, potentially even identify the masterminds of the scheme, who are located abroad in China and North Korea.  However, they would not be able to carry out this scheme without these U.S.-based facilitators.

So an essential ingredient of the scheme is these U.S.-based individuals who are willing to commit fraud, who are willing to hand over access to sensitive systems to overseas individuals for some extra cash, and so that's why, you know, we think it is very important to combat the scheme to hold accountable those who we can hold accountable here in the United States.

And as I mentioned previously, this is, I believe -- based on my conversations with the National Security Division, I believe this is only the second case like this involving the DPRK or North Korea IT worker scheme to proceed to sentencing. So there are many cases that have been charged, but I think this is only the second to go to sentencing.  And I suspect that the North Koreans are going to be, you know, watching the sentencing closely, and their U.S.-based facilitator counterparts will also be watching it closely.

And so we do think that a sentence of home confinement

would send exactly the wrong message.  We do think that a prison sentence is necessary to promote respect for the law, to reflect the seriousness of the crime, and to deter other would-be facilitators.  We certainly don't think it should be a very lengthy prison sentence.  Not to minimize; I mean, 30 months is not nothing, but we're not asking for anything close to what they asked for in the Chapman case.

We are asking for 30 months, and I have really done my best to weigh all the factors.  I have -- as I said, I have heavily weighed Mr. Vong's acceptance of responsibility, his lack of criminal history, his many sympathetic factors that Ms. Reamy has done an excellent job of bringing to the Court's attention, but ultimately, where I do come out is that a sentence of less than 30 months would not fully balance all the 3553(a) factors.

THE COURT:  All right, thank you very much.  I may have some more questions for you after I hear from Ms. Reamy.

MS. HOFFMAN:  Sure, thank you.

THE COURT:  Ms. Reamy.

MS. REAMY:  Yes.

Your Honor, if I may, I think, starting with illuminating more the differences between Ms. Chapman's case and Mr. Vong's case is important, because I think, when you look closely at those differences, you start to see that they really are at opposite ends of the spectrum, in terms of this kind of

case.

Ms. Chapman was involved in and facilitated the theft and use of 68 Americans' identities.  Those 68 Americans were the ones who suffered the tax obligation consequences, unlike Mr. Vong, who used -- allowed his own identity to be used, and he paid -- it's $114,000 in taxes that he paid.

THE COURT:  So how much did he net from this?

MS. REAMY:  Well, without being precise -- because the percentage changed over time.  Most of the time, he was getting about 20 percent.  It was towards the end, as Mr. Vong started to realize that this tax obligation was hitting him, that he started to complain, look, this tax -- I owe all this tax.  And he doesn't even know about all of the companies.

So while he may have started out willingly, William James then goes and runs rampant with his identity, getting all kinds of other jobs that Mr. Vong doesn't know about until he starts seeing the influx of income and the tax consequences of it.

So it's towards the very end that he starts to -- where the -- his percentage goes up, to try and offset that for Mr. Vong, because -- and he even tells William James that, you know, he doesn't want to do this anymore, but the problem is, that's followed with a threat, well, you know, if you stop, then all of the money stops too, and now, he's got this problem of a snowballing tax obligation, and that's why he continues to

do it.

So it's about -- what was it, $950,000, roughly; is that the exact number?  I don't have it in front of me.

MS. HOFFMAN:  I think it's around $970,000 -- 977,538.

MS. REAMY:  Right, so 977.

So 20 percent of that -- let me just use that figure. It's 195,000 minus 114,000.

THE COURT:  All right, you've lost me a little bit. So my question is, do you know how much he made?  If you don't, we can move on.

MS. REAMY:  Not precisely.  I mean, I think --

THE COURT:  Approximately.

MS. REAMY:  Around 80 grand.

THE COURT:  All right, thank you.

MS. REAMY:  There were 309 U.S. companies that were infiltrated in the Chapman case.

There were 14 -- again, Mr. Vong is not aware of all of them, but --

THE COURT:  389 companies?

MS. REAMY:  309 --

THE COURT:  Thank you.

MS. REAMY:  -- companies involved in the Chapman case, compared to 14 in Mr. Vong's case.

There was $17 million in revenue that came from that in the Chapman case, and we've just established around 970-some

thousand dollars in this case.

There were two U.S. companies that were known to have data scraped from their servers.  So the government has the capacity to determine that, and yet, there is no evidence that that's happened in this case.

One of the most important aspects of the sentence, according to the transcript, in the mind of the sentencing Judge, was the sheer scale of that operation involving Ms. Chapman, but there are other key differences:  She was forging documents, government documents and checks; she hosted more than -- she hosted 92 computers in her home, as opposed to Mr. Vong hosting one; she shipped 49 laptops overseas, whereas Mr. Vong shipped 2.

No indication that she cooperated with the government; in fact, she obstructed justice, she lied to the government. She deleted communications between her and her coconspirators. She also acknowledged -- early on, at least 15 months before the end of the conspiracy, there were communications between her and coconspirators where she acknowledged that she had talked to a lawyer, who had advised her that what she was doing was illegal, and then, days later, there was another discussion where she specifically referenced that she could go to federal prison for doing what she was doing.

She was extravagant with the spending.  She had multiple servants or assistants that she had hired with the

money, nothing like what we see in this case.

She also seemed to very clearly understand that she was working with an enemy of the United States government. Mr. Vong did not understand that; Mr. Vong comes into this playing a video game on his phone, which he would do frequently, as he was reeling from a devastating breakup with his --

THE COURT:  Well, he knew this individual was from China, and Ms. Hoffman has identified a communication, early on in the four-year scheme, indicating that Mr. Vong knew there was at least a potential connection to North Korea.  So while this might not be the same as Ms. Chapman, where she says, "I am working for people in a country considered an enemy of the U.S.," he had to have known these people were not for our country.

MS. REAMY:  No, no.  Mr. Vong and I have discussed that, beginning -- including way back at the beginning of this case, because that communication was certainly something I became aware of early on in the discovery process.  That was early on in the relationship with Mr. William James.  Mr. Vong has consistently told me that he was referencing a game.  He was in a game called Rise Up Kingdom [sic], all right?  When he made that statement -- he understood that William James, John Doe, was in China or Indonesia, he did not know where, but his -- that specific statement, Mr. Vong has explained, was a reference, a joke; it was connected to the game that they were

playing.  It was not an acknowledgment that he understood who he was dealing with.

THE COURT:  I'm not a gamer; I don't know what Rise Up Kingdom is.

MS. REAMY:  I'm not either, but that has consistently been his explanation for what it was; it was a reference to the game.

And that is how they got to him.  Mr. Vong didn't go out seeking to become involved in this, and this individual, William James, he developed a relationship with Mr. Vong, who is a -- is known to be, characteristically, a private, reserved, introverted person, doesn't share a lot about his personal life.

So I think that says something about the sophistication of the individual who is targeting Mr. Vong, and he's being targeted at a time where he is particularly vulnerable.  Dr. O'Connell goes through not only his -- he goes through the intellectual testing that was performed, the personality testing, and the diagnosis that stemmed from that, and the life circumstances that all converged in 2020, at the time that this began, to make Mr. Vong vulnerable to lots of different influences but in this particular case, a very sophisticated mal-intended, potentially, it sounds like, government op- -- foreign government operative, and Mr. Vong did not know that.

William James played on sensitivities that Mr. Vong

had.

THE COURT:  So Ms. Reamy, I don't disagree with you, and I don't think the government does either.  In many respects, that cuts in your favor, but in other respects, it doesn't, because this may be a pattern and an opportunity that North Koreans see.

You know, everyone knows that everywhere around the world, including the United States, perhaps depressed people are maybe gaming, or they are seizing on people who are gaming a lot and perhaps are engaging in fantasies on the internet.  And so your client may be the exact type of person that they were targeting, and there may be others that will be targeted.

So what should we do about that?  There needs to be a deterrent effect.

MS. REAMY:  Well, there's nothing that we can do about what they're doing, right, it's a very sophisticated attack, but I think we have to recognize that Mr. Vong on one level is culpable and is a perpetrator, but that's limited; he's also a victim, to some extent.  And I don't know that imposing a harsher sentence on Mr. Vong, under all these circumstances, to try and prevent a foreign national from targeting him is the answer.

I think, in a situation -- for example, Ms. Chapman, who seems to have much more understanding of what she's doing, who she's dealing with, and has a more of a willingness to still

participate, sets Mr. -- sets her apart from Mr. Vong, but --

THE COURT:  I --

MS. REAMY:  Go ahead.

THE COURT:  Listen, we can all agree and I think Ms. Hoffman agrees and can't dispute the important differences that you've highlighted between this case and Ms. Chapman's case.  We can also agree that any sentence that is imposed here will be nowhere near what Ms. Chapman got.  So the differences are profound, and the differences will be reflected in the sentence.

The real question for me is, you have asked for a non-incarcerative sentence.  That's a big ask in this case.

MS. REAMY:  It is.

THE COURT:  So I'd like to hear more about why you think that a non-incarcerative sentence comports with the 3553(a) factors.

So I'm happy to hear more about the offense if you'd like, but I certainly would like to hear about the other factors from you.

MS. REAMY:  Sure.

I would start with the fact that this is completely anomalous behavior for Mr. Vong.  He's 41 now, he was 37 when he became involved in this, had lived a completely law-abiding life.  Already discussed how he comes into this, which I think is also something we'll see less frequently, but he -- he's

never committed any crime.

And I think that says a lot.  When he's -- when law enforcement comes to his home, he's immediately cooperative; at one point, he said he was relieved because he didn't know how to stop this.  I think that his past history, his conduct in this case so far demonstrates an extremely low risk of recidivism in this case.

There is also a concern, and I think a valid concern, for the impact that any incarceration would have on his children.  He's got two children:  He's got a 15-year-old daughter, who's thriving and doing well, she's healthy, she's a normal 15-year-old girl; he has, unfortunately, a 13-year-old son who is in a very difficult and different situation.  He has a very rare -- yes, Your Honor; I see a question.

THE COURT:  No, go ahead.

MS. REAMY:  He has a very rare diagnosis, you know, Coffin-Siris Syndrome, it puts extreme parental care responsibilities on Mr. Vong, and he's effectively a single parent.  His -- the mother of these children has displayed nothing but disinterest, and she has no relationship with her 15-year-old daughter.  She has sporadic contact with her son, special needs.  He -- she doesn't seem -- while she could be compelled to step into her parental responsibilities, she doesn't seem to have any interest in doing so.

And this is something that has been so difficult for

Mr. Vong emotionally.  I mean, he -- during the presentence interview, when we got to this subject, he became emotionally overwhelmed.  He feels that it's incredibly -- he loves his children; let me make that clear.  But he also --

THE COURT:  I need to hear more about his son.  I've read what the disease is, I've read the letter from the Maryland Department of Health.  A lot of this is under seal.  Actually, all of it is, but -- I won't go into too much detail, but there's Department -- a letter from the Maryland Department of Health from September of 2019, approving the child for enrollment in Maryland's Rare and Expensive Case Management Program.  I understand that the boy is in public school but is perhaps in a different program in school.

So tell me more about the child's needs and who is -- how Mr. Vong is caring for the child and who would be available to care for the son in his absence.

MS. REAMY:  Okay.  So Mr. Vong is the primary caretaker of both of his children.  Unfortunately, his son -- one of the symptoms of -- characteristics of his disease is that he is physically aggressive.  That has manifested through aggression towards Mr. Vong's daughter.

In response to that, Mr. Vong, feeling a need to make sure that his daughter was safe, especially when he's trying -- you know, he's sleeping overnight; he needed to have him out of the home.  So Mr. Vong picks him up every morning from his

parents' house.  He takes him to school.  He picks him up from school, he spends time with him after school, in the evenings. He then returns him to his parents' home for the overnight hours.  And then he does that all over again.  His wife -- not his wife but his -- their mother is not involved in any of that.

The sole reason that Mr. Vong's parents -- Mr. Vong takes his son to his parents is just for the overnight hours; he has to protect his daughter.  But he does everything else:  He financially supports him, he makes sure that all of his needs are met.  And his parents are in their 70s, so this will go on as long as they're capable of helping in that regard, but there -- this is the lim- -- it's limited to allowing him to stay there overnight.

There are other issues.  I mean, A.V., you know, he has -- he has the characteristic physical deformities, he's got intellectual disabilities, he's got vision problems, he's got -- he suffers from seizures; there's a lengthy list of problems, and we provided the documentation that he has been enrolled in the Maryland program that helps to assist families with individuals who have these disabilities.

THE COURT:  So if your client is incarcerated for a period of time, who will take care of this child?

MS. REAMY:  It does not appear -- the only one that appears to be in any position to do that, to take -- to fill the shoes of Mr. Vong, if she was willing, would be their mother.

She has given up custody willfully, and she has shown no interest in developing relationships or caring for her children.

So while technically, that's possible, realistically, I don't think it is, and I think that even if that were to be forced, it would have a profound impact on the children.

And even though we've moved into a world where there are no departures, depending on how the Court looks at the alternative, that being the mother, there is support for a variance under the former departure, 5H1.6, which are now to be considered only in a 3553(a) analysis.

THE COURT:  Well, I understand his parents are in their 70s, they are allowing their grandson to stay with them overnight; why aren't they an option?

MS. HOFFMAN:  Mr. Vong does not believe that they will be able keep up with the needs of A.V. or that they can accommodate both children, accommodate, you know, the school transportation issues, or the financial support.

THE COURT:  What about his brother, whom he's close with, who he works with and lives in Bowie?

MS. REAMY:  Right.  That -- I don't think that there is any willingness there, is my understanding.  Mr. Vong has -- he's 6 of 8 children.  All but his parents and his one brother are scattered across the United States.  Mr. Vong's brother, even though he's the closest with him, he's not here today in support of him; Mr. Vong is here alone.  They don't have -- and

I mentioned in the sentencing memorandum, you know, there is not -- and it's unfortunate, but there is a lack of depth in the family relationships; there's not -- the help that he is receiving appears to be the extent of it.

So -- and it's something that -- you know, Mr. Vong has been carrying this on his own shoulders, with limited help, all along, and it's something that, you know, he doesn't -- he understands he has to do it; he loves his children, he loves his son.

He is still resentful towards their mother; that is something that, you know, he's working through.  He does think it's incredibly unfair, you know, that she, as he put it, is off living her life, and he, you know, understands his obligations to make sure that his children are cared for and that they have the financial support, that they have, you know, a safe, nurturing home to live in, and that -- you know, that they have strong bonds.

He's a good parent.

And he is distraught over the fact of what might happen, you know, if his children's mother is forced to step into his shoes.  So it's a -- it's ... it's a big -- it's a big issue for him, and it's a real issue for the children.

Mr. Vong has never -- as we've said, he's never committed a crime in his life, which means he's never, ever served any time in prison, he's never served any form of

probation, he's never been under home confinement.  Any sentence that is imposed is going to be significant to him.

I don't think that there's any risk to the public, at this point, with him.  There's an extremely low risk of recidivism.  There is a need -- well, he certainly is personally deterred, and we've already touched on the fact that -- and it's valid; yes, there is a need to send a message of deterrence to others, and there is a need for punishment.  Those are real aspects of the sentencing objective.

But I still think, with all -- under all the circumstances, a non-incarceration sentence for Mr. Vong is appropriate.  I think the example is rightly set in Ms. Chapman's case, and I think that if there weren't such mitigating factors in Mr. Vong's case, then a 30-month term of imprisonment would be appropriate, potentially.  But I think, an incarceration sentence will do -- it will serve the purpose, I think minimally, of general deterrence.

Specific deterrence is not necessary.  I think Mr. Vong has been --

THE COURT:  And also, the goals of promoting respect for the law, punishment, reflecting the seriousness of the offense.

MS. REAMY:  Yes, I agree.  Does 30 months -- does incarcerating Mr. Vong do that in this case?  I don't think so.

THE COURT:  Let me ask you this.

This is not a binary choice on my part. I don't have to give 30 months, I don't have to give home detention; there is a wide range of time in between.

What do you suggest if I were going somewhere in between? And I understand your position is home confinement. You are not betraying your client by answering this question. If you don't want to answer it, you don't have to, but I'd like to hear from you on what you think perhaps would be an appropriate incarcerative sentence below 30 months.

MS. REAMY: That's quite a paradox for me.

THE COURT: Well, I want to be clear, Ms. Reamy. If you don't feel comfortable answering it, you don't have to; it's my job to make that decision. So I'll let you off the hook if you would prefer not to. You could even take a minute if you'd like to think about it.

Because I'll be asking Ms. Hoffman the same question.

MS. REAMY: Right, I understand.

You know, I just don't know how to put a number on it, because what I keep thinking about is, let's say I said a year and a day; that year and a day may check the boxes for promoting respect for the law, it may check the box for providing just punishment, but the cost that will flow from that will be borne by his children. And I don't think it matters whether it's 30 months, a year and a day, 6 months, or weekends; I think that they will suffer under any circumstance.

And I think that is the reason that this Court should not impose a sentence of incarceration, in addition to Mr. Vong's history and charac- -- personal history and characteristics outside of his children, his specific vulnerability in this case, and the stark differences between his case and Ms. Chapman's.

Does the Court have any other questions?

THE COURT:  No, not right now.  Thank you, Ms. Reamy; you've done an excellent job.

Ms. Hoffman, let me ask you a similar question.

The truth is, I don't think your 30-month request is unreasonable, I don't think it's necessarily inappropriate. However, as I'm sure you can you imagine, you've heard, there are very compelling personal circumstances here, with -- I mean two children, but in particular, the boy, with this rare genetic condition and that manifests itself in his physical aggression, physical deformities, intellectual disabilities.  He is the sole caregiver; the child's mother apparently wants nothing to do with the difficulty of this young boy.

What do I do about that?

MS. HOFFMAN:  Yeah, it's -- it's really hard.  I have a tremendous amount of sympathy for the children, as a mom myself.  You know, it does sound to me as though, you know, Mr. Vong is at least lucky to have parents who are willing to step in and provide quite a bit of support.  You know, it does

sound to me like that is a potentially viable option, for them to be with the grandparents, and of course, the mother is at least capable, even if she hasn't demonstrated a great desire to care for the children.  It's a really sad circumstance, and I -- you know, I don't mean to appear unsympathetic at all.

It's a difficult circumstance in a lot of these cases. I mean, I -- my history in the office has been mostly with -- you know, I did a long time in the violent crimes section, and in a lot of those cases, there are just really distressing stories of children who are not getting the care that they deserve, and --

THE COURT:  This is slightly different.  I, too, have had similar experience as you in criminal cases in the District of Maryland, and certainly, children are always affected in a case where a person has a child; it goes without saying.

This does seem to be slightly different, in that we have a sole caregiver and a mother who has given no indication that she wants to care for these children.  And in particular, the son has some significant special needs.

So let me ask you the question I asked Ms. Reamy. Again, I'll let you off the hook if you don't feel that you can answer it while still maintaining, you know, loyalty to your position as an Assistant United States Attorney.

What sentence do you think might -- below 30 months might try to reflect all of the goals of sentencing and take

into consideration the unique personal history, characteristics, and current situation, custodial situation that Mr. Vong's case presents?

MS. HOFFMAN:  Yeah, I mean, I really -- and I'm sorry it's maybe not the answer you want to hear, but I really have done my best to take those circumstances into account in coming up with my recommendation.  You know, I think --

THE COURT:  Well, your recommendation is a guideline sentence, so do I take it from the United States Government, there is no justification for any variance whatsoever in this case?

MS. HOFFMAN:  No.  I mean, I -- look, I think these cases are always hard, and the Court has to, you know, balance the factors the way the Court sees fit.

THE COURT:  Okay.

MS. HOFFMAN:  I -- in my mind, I think that those -- you know, those are significant factors to consider, but I also think that, you know, the conduct in this case, the length of time over which it elapsed -- I think also, you know, I did want to just push back a little bit on a couple of the points that Ms. Reamy made.

First, in terms of the -- you know, the North Korean alliance, it may have been a joking reference to some aspect of the game, but it followed -- it followed William James' comment that he was in Shenyang, China, and the response was, oh,

North Korean alliance.  So there's clearly a knowledge on his part that he's located in a city close to North Korea and that -- I believe that there's some potential connection, even if it was a -- also a joking reference to the game.

And then, in terms of the profitability -- I just had a chance to do the math here real quickly as Ms. Reamy was talking -- you know, the total amount of money generated is 977,000.  He is proffering that he paid 114,000 in taxes and has also admitted that he kept 20 to 30 percent for himself.  And so you know, if we take the 20 percent, that would be $195,000, 30 percent would be $293,000, and so that means he profited somewhere between 81,000 to 179,000, and that's taking him at his word for how much he paid in taxes, because as I mentioned, we did not get a tax order in this case; we probably should have.

But so it was profitable, and also, just as a matter of common sense, he would not have continued doing this for four years if it was not profitable.  This wasn't -- you know, in some of the other North Korea IT worker cases, where there are stolen identities, the money being paid by the companies is going to bank accounts set up in the identity of the -- the fake ID of the people whose IDs are stolen, but in this case, that wasn't happening; it was his ID that he was using, and the money was coming to his bank account, and he was then transmitting it to overseas -- people overseas.

And so he -- you know, he had some control over his situation and continued doing it for four years, roughly four years, which I think -- you know, he wouldn't have done it if it wasn't profitable.  Is it a huge amount of money?  No, but it -- you know, it was worth it to him, and I think those are important factors to consider.  I -- you know, the -- I -- my -- I certainly agree that his son's situation is heartbreaking, and I -- you know, there's really not -- yeah, it's just -- you know, it's heartbreaking.  I do think, though, that his parents are around, the mother is around, and that there are options for these children if there is an incarcerative sentence.

THE COURT:  All right, thank you.  Just give me a few minutes.

Actually, I'm going take short recess.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now stands in recess.

(Recess taken from 11:31 a.m. - 11:54 a.m.)

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now resumes back in session.

THE COURT:  All right, please be seated.

All right.  I'd like to thank counsel for their excellent presentation, both in writing and orally here today.

MS. REAMY:  Your Honor, I'm so sorry.  Just for --

THE COURT:  Oh, my goodness, I'm so sorry; I cannot

believe I forgot to advise Mr. Vong of his right to speak.  I apologize.  Thank you for interrupting me.

Mr. Vong, before I pronounce sentence on you, you have the absolute right to speak to the Court.  If you do not say anything, I certainly won't hold that against you, but if you have something to say, I'd be happy to hear from you.  And my sincere apologies for not advising you of that earlier.

THE DEFENDANT:  It's okay.  I'm just really sorry for what I did.  I really love my son, and I want to be with him.  And again, I'm really sorry for everything.

THE COURT:  Thank you very much.  Thanks.

All right.  I have to apply the factors under Title 18 of the United States Code, Section 3553(a) to determine what sentence is sufficient but not greater than necessary to meet the goals of sentencing that are in the statute.

I start with Mr. Vong's history and characteristics.  Mr. Vong is 41 years old.  He was born in Vietnam.  He is one of seven children.  The family lived in extreme poverty for the first six years of his life, until 1990, when they fled Vietnam and went to a refugee camp in Indonesia.  There, he and his family were extremely poor.  The children were malnourished and undernourished.  There certainly was not enough food to go around to feed everyone.  There was no electricity, the family was itinerant, he went to school sporadically, and he saw people burning themselves.  These are truly horrifying living

conditions for anyone, especially for a child.

In 1995, the family immigrated to the United States, Hawaii in particular, and Mr. Vong graduated from high school in Hawaii in 2003.  He eventually moved to Maryland with one of his brothers.  His parents are here as well.

He has two children, a 15-year-old daughter and a 12-year-old son; he might be 13 now, but in any event, a daughter and a son, who are teenagers.  They live with him.  He has primary custody of them.  In fact, I believe he has sole custody of them.

His son has a rare genetic condition, called Coffin-Siris Syndrome, that causes developmental delays, physical aggression, intellectual disabilities, and physical abnormalities.  His son stays the night at his parents' house, because it's safer for his daughter, but otherwise, Mr. Vong takes care of his son, takes him to school, spends time with him, and cares for his emotional and physical needs.

Their mother is not engaged in their lives. Mr. Vong's son will need care for the rest of his life. Mr. Vong has been a nail technician in Maryland for almost 20 years.  He is currently employed and makes approximately $20 an hour, plus tips.  He owns his home in Bowie, where he lives with his two children and renters.  He has no criminal history whatsoever.

His physical health is fair to good.  As for his

mental health, I understand from the record that he has depression and anxiety, and he has been attending therapy while on pretrial release and takes medication as prescribed. Mr. Vong does not abuse alcohol or illegal substances.  He remains very close with his brother, who works with him.

I turn to the nature and circumstances of the offense. Mr. Vong committed a very serious offense.  Over four years, he allowed a foreign actor, living in China, who Mr. Vong knew as William James, to use his personal information and U.S. citizenship to obtain work as a remote IT contractor for U.S. government contractors.  Mr. Vong met this person over the internet on a gaming platform.  Mr. Vong participated in interviews with the companies over Zoom, where he held up his U.S. passport and Maryland driver's license to verify his citizenship and his identity.

Mr. Vong did not have the credentials to be a software developer, and he lied about them in his applications.  Once the jobs were secured, Mr. Vong would send the foreign actor work-issued laptops.  There were two that were sent over this period.  And the foreign actor did software development for the companies, but at the same time, they had access to sensitive government systems and used the salary to fund the North Korean government.  This of course posed a national security risk.  The U.S. contractors would send salary payments to Mr. Vong, who would then send between 70 to 80 percent, typically 80 percent

of the money to the foreign actor.

Over the course of four years, Mr. Vong used or allowed to be used fraudulent misrepresentations to obtain employment with 14 different U.S. companies, involving four United States agencies, and those companies collectively paid him more than $970,000 in salary for software development services that he allowed a foreign actor to perform under false pretenses.

This is an extremely serious offense.  I have to consider the goals of sentencing.  I start with the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment.  These goals absolutely require a period of incarceration.  Nothing short of incarceration will achieve them.

I have to consider the need to afford adequate deterrence to criminal conduct, both specific and general deterrence.  As for specific deterrence, I find that Mr. Vong has been sufficiently deterred by this arrest and prosecution, he has no criminal history, and I do not believe a period of incarceration is necessary to achieve the goal of specific deterrence in this case.

General deterrence is another matter.  I must consider it, and in this case, I think it's a very important goal, and it requires a period of incarceration.

I have to consider the need to protect the public from

further crimes of the defendant.  I do not believe Mr. Vong

possess a future danger to the community.  I appreciate the

government's appropriate evaluation of this factor and the

specific deterrence factor.  The only danger that Mr. Vong could

pose in the future would be economic in nature, and I think

Mr. Vong has been sufficiently deterred by this prosecution from

committing fraud again.

So the goal of the need to protect the public from

future crimes of Mr. Vong does not require a period of

incarceration.

I have to consider the need to provide him with needed

educational or vocational training, medical care, or other

correctional treatment in the most effective manner.  This goal

is not particularly relevant in this case, because Mr. Vong,

based on the information before me, does not need vocational

training, education, or unique medical care.

So upon consideration of those various goals of

sentencing, several of them require a period of incarceration

and some do not.

I move from the goals of sentencing and return to the

other 3553(a) factors.  I now consider the kinds of sentences

available.  They are, of course, prison, probation,

home confinement.

I have to consider the federal sentencing guidelines.

As I stated earlier, they are certainly not unreasonable in this

case, here, but I do not think they take into account Mr. Vong's sole parental responsibilities for his children, in particular, for his son, who has significant special needs.  I am not aware of any pertinent policy statement issued by the Sentencing Commission that I need to consider.

I have to consider the need to avoid unwarranted sentencing disparities among defendants with similar records and culpability.  This is a particularly interesting factor in this case.  Counsel have brought to my attention the case of Christina Chapman.  She is the only comparator that's been sentenced that I am aware of.  She was convicted after a guilty plea in the District Court for the District of Columbia and sentenced this summer to 102 months.

Ms. Chapman's crime was similar.  She provided personal information to foreign actors, who then obtained employment with American companies as software engineers.  However, she provided her personal information to the foreign actors, who used it to obtain the personal identification of 68 Americans, whose IDs were used to commit the crimes.

Mr. Vong, by contrast, did not steal or enable the theft of other people's identifications.  Ms. Chapman's crime involved over 300 American companies, whereas here, 14 companies were involved.  Ms. Chapman obstructed justice and lied to the police.  Mr. Vong did neither of those things, and he immediately accepted responsibility for his actions.

Ms. Chapman admitted that she knew she was working for an enemy of the United States.  Mr. Vong certainly knew that the person he sent the laptops to was in China, and he knew that the person was located very close to North Korea.

So Ms. Chapman is the best comparator we have.  The circumstances of her case and the extent of her criminal conduct, as the government agrees, are more severe than in Mr. Vong's case, and Mr. Vong's sentence will be significantly less than her sentence of 102 months, which -- of course, a component of which was 24 months on the ag ID, which was consecutive to the conviction on the other two wire fraud counts.

I have to consider the need to provide restitution. It's not an issue here; there's been no request for restitution.

So upon consideration of all the factors under Section 3553(a), I find that the sentence that is sufficient but not greater than necessary to comply with the purposes set out in the statute is 15 months' incarceration, followed by a period of 3 years of supervised release and 6 months of home confinement during that period.

I will set the self surrender date out 60 days to allow Mr. Vong to make arrangements for the care of his children.

Let's talk about the supervised release conditions. In the presentence investigation report, at -- which is ECF 34

at pages 18 through 19, the mandatory and standard conditions of supervision are listed.

Ms. Reamy have you gone over these with your client?

MS. REAMY:  Yes.

THE COURT:  All right.  Do you need me to go over them with him now?

MS. REAMY:  No, Your Honor.

THE COURT:  All right.

Mr. Vong, have you reviewed the mandatory and standard conditions of supervised release?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  Do you need me to read them into the record?

THE DEFENDANT:  No, Your Honor.

THE COURT:  All right.  You understand them?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  I will impose the mandatory conditions and the standard conditions that are set forth in the PSR, and I adopt those; I think they are appropriate under 3583.

Ms. Hoffman, any objection to suspending the drug testing condition?

MS. HOFFMAN:  I don't have any information to suggest that it's necessary in this case; I defer to Probation on it.

THE COURT:  Ms. Wonneman?

THE PROBATION OFFICER:  I don't think it's necessary,

Your Honor.

THE COURT:  Okay.

All right.  I will suspend the drug-testing condition based on my determination that Mr. Vong poses a low risk of future substance abuse.

As for the special conditions, there are four that are identified in the PSR.  The fourth is paying any monetary restitution that's imposed.  None has been imposed, so I certainly won't impose that condition.

Any objection to the other three, Ms. Reamy?  The first is mental health treatment, the second is the access to financial information, and the third is not incurring new credit charges or opening additional lines of credit.

MS. REAMY:  No, Your Honor.

THE COURT:  All right.

Ms. Hoffman, do you care to be heard on those conditions or any other special conditions?

MS. HOFFMAN:  No, I think that covers it.  Thank you.

THE COURT:  All right.

So Mr. Vong, let me just explain to you what the additional or special conditions are in your case.

You must participate in a mental health treatment program and follow the rules and regulations of that program. The probation officer, in consultation with the treatment provider, will supervise your participation in the program,

meaning the provider, the location, modality, duration, and intensity.

The second special condition is that you must provide the probation officer with access to any requested financial information and authorize the release of any financial information.  The Probation Office may share the financial information with the United States Attorney's Office.

Finally, you must not incur new credit -- no, this says, incur credit charges.  I mean, what does that mean; he can't use a credit card?  I don't think that's what we're intending.

THE PROBATION OFFICER:  No credit lines, Your Honor, is what we're suggesting, without advising the officer and receiving permission, so that we're able to monitor his financial situation.

THE COURT:  So just so I understand it, Probation wants to prohibit him opening new credit lines; is that correct?

THE PROSPECTIVE JUROR:  Correct.

THE COURT:  All right.  So let me just reword this.

You must not open new lines of credit without the approval of the probation officer.

Do you understand these conditions of supervised release, Mr. Vong?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.

Are there any open counts that need to be dismissed, Ms. Hoffman?

MS. HOFFMAN:  No, I don't believe so.  I have failed to bring the indictment with me, but I'm pretty sure he was just charged in a one-count indictment.

THE COURT:  Yes, that's correct; that's all I see.

Ms. Reamy, do you agree?

MS. REAMY:  I think that's correct.

THE COURT:  Okay.  Ms. Reamy, any recommendations to the Bureau of Prisons?

MS. REAMY:  If the Court -- I think he most likely would be designated to a camp, but I would ask the Court to make that recommendation closest to Maryland, Bowie in particular. I think -- well, it doesn't matter.

I did ask him about vocational training.  I think he's open generally but hasn't specified any particular one.  He has his GED, and certainly, mental health, I think, is very important.

And there's one other thing I -- oh, I believe he's entitled to 1 day of credit for the day of his arrest.

THE COURT:  All right.  So I will recommend to the Bureau of Prisons that Mr. Vong be designated to a camp as close to Bowie, Maryland as possible.  As we all know, that will essentially mean within 500 miles of Bowie.

Let me also just be clear that another condition of

supervised release is the 6 months of home confinement.  During that period, Mr. Vong will be allowed to leave for work, to take his children to and from school, medical appointments, for his own medical appointments, and for any other reasons that Probation preapproves.

Let me clarify that.  I'm going to read the condition that we generally adopt here in Court; I don't want there to be any confusion.

So for 6 months on supervised release, Mr. Vong, you will be restricted on 24-hour lockdown at your residence except for medical necessities, attorney visits, Court appearances, employment, taking your children to school, medical appointments, and school-related activities, and any other activity specifically approved by the Court or the probation officer.

You will be monitored by the form of location monitoring of radio frequency monitoring for a period of 6 months, and you must follow the rules and regulations of the location monitoring program.  I will not require you to pay the costs of the program.

THE PROBATION OFFICER:  Your Honor, those are -- for the purposes for the probation officer in the future, if we could please -- I know you indicated taking the children to school, but also to and from, perhaps --

THE COURT:  Okay.

THE PROBATION OFFICER:  -- just so that there's no question down the line.

THE COURT:  Yes, to and from school.

THE PROBATION OFFICER:  Thank you, Your Honor.

THE COURT:  Thank you.

All right.  Are there any questions about the conditions of supervised release, Mr. Vong?

THE DEFENDANT:  No, Your Honor.

THE COURT:  So I have a self-surrender date of February 2nd, 2026.  That's 60 days, which is a bit longer than we usually allow.  I will push that out 60 days to allow you to make sure that your children have childcare in your absence.

Is there anything else from the position of the United States?

MS. HOFFMAN:  No.  Thank you very much.

THE COURT:  All right, thank you.

Ms. Reamy.

MS. REAMY:  No, Your Honor, thank you.

THE COURT:  All right.

All right.  You have 14 days to file a notice of appeal if you think you have any grounds for an appeal, Mr. Vong.

Thank you very much.

THE COURTROOM DEPUTY:  All rise.  This Honorable Court now stands adjourned.

(The proceedings were adjourned at 12:18 p.m.)

*       *       *

CERTIFICATE OF OFFICIAL REPORTER

I, Patricia Klepp, Registered Merit Reporter, in and for the United States District Court for the District of Maryland, do hereby certify, pursuant to 28 U.S.C. § 753, that the foregoing is a true and correct transcript of the stenographically-reported proceedings held in the above-entitled matter and the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 10th day of January, 2026.


_____/s/_____
PATRICIA KLEPP, RMR
Official Court Reporter